# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 04-1053

———————

United States of America,    *
                             *
　　　　　Appellee,           *
                             *    Appeal from the United States
　　　v.                      *    District Court for the
                             *    District of Nebraska.
Adil Gasim Al-Dabbi,         *
                             *
　　　　　Appellant.          *

———————

Submitted:  August 26, 2004
Filed:  November 12, 2004

———————

Before LOKEN, Chief Judge, WOLLMAN, and BEAM, Circuit Judges.

———————

WOLLMAN, Circuit Judge.

Adil Gasim Al-Dabbi appeals from the judgment entered on the jury verdict convicting him of conspiracy to distribute and possess with intent to distribute cocaine in violation of 21 U.S.C. § 846, and sentencing him to 292 months in prison followed by 5 years of supervised release. Al-Dabbi argues (1) that the district court[1] erred in allowing testimony regarding his assault on a member of the conspiracy and his connection to a firearm and (2) that his due process rights were violated by the government's late disclosure of its financial assistance to a key witness. We affirm.

---

[1]The Honorable Richard G. Kopf, Chief Judge, United States District Court for the District of Nebraska.

## I.

At trial, various witness testified about the existence of a drug-dealing operation, Al-Dabbi's place within it, and his efforts to control it. Stephan Evans and Venus McCray, both testifying pursuant to plea agreements, were among these witnesses. The issues presented on appeal pertain to their testimony—specifically, to the substance of what Evans was permitted to discuss and to McCray's credibility in light of a disclosure made by the prosecution while she was on the stand.

Evans met Al-Dabbi during the Summer of 2002, when he and a friend traded $400 worth of cigarettes for cash and crack from Al-Dabbi. It was at that same encounter that Evans met Al-Dabbi's wife, Ha Nguyen (a.k.a. Lila). After this meeting, Evans began to have regular contact with Al-Dabbi and Lila, frequenting their restaurant and home to purchase and trade for crack. This crack was of such size and potency that Evans succeeded in finding people who paid him to obtain and deliver it to them. Evans saw much of Al-Dabbi and Lila, including their relationship and interactions, though each individually sold to him on numerous occasions. On one such occasion, Evans observed cuts or scratches on Lila's face and neck. She confided in Evans that her husband was going to kill her. She produced a gun that she had removed from the house while Al-Dabbi slept and asked Evans to sell it. This request came shortly after a time when Lila had gambled away "all the money," presumably including the drug profits. Evans described a later instance in which Al-Dabbi came home from work to discover Lila playing on the computer. Al-Dabbi "snatched [it] away from her," going so far as to pull corresponding plugs out of the wall. As Evans was leaving the house, he advised Al-Dabbi to "chill out . . . because it ain't worth it." The next day, Evans observed that Lila appeared to have a broken finger. "See?" she said to Evans, "See my finger. This is what my husband did. I got that for you. He did this for you."

At the time of the trial, McCray had been using crack for seven years and considered herself an addict. She had known Evans "forever," and it was through

-2-

Evans that she came to know Lila and Al-Dabbi in 2002. From that point forward, she purchased crack from them on numerous occasions. In her own words: "To a crack addict, it was real good stuff." McCray agreed to provide assistance to law enforcement and, in exchange, the Lancaster County, Nebraska, Attorney's Office dismissed a charge pending against her. Her assistance consisted in making contacts with people involved in the drug trade, purchasing drugs for the Lincoln, Nebraska, Police Department, and wearing a wire transmitter so that audio recordings of purchases could be made. The prosecution waited until the first few minutes of its direct examination of McCray to disclose that the U.S. Attorney's Office had agreed to give her money for housing. Hearing of this arrangement for the first time, the district court excused the jury, informed the prosecution that "under the relevant federal statute, a witness cannot be paid by the government for his or her testimony," and asked that a foundation be laid in this regard. During the resulting line of questioning, the court learned that this assistance came only after McCray had reported receiving threatening phone calls and met with the victim/witness assistance person. When asked if this assistance was provided in return from her testimony, McCray responded, "No, it was for my safety." She further testified that, in her understanding, the government would be obligated to fulfil its promise of assistance regardless of the substance of her testimony. At the time of the trial, McCray had not found permanent housing and presumably was relying on the government's offer to "help [her] with making [sic] a deposit and perhaps first month's rent on an apartment if [she] found one," and perhaps provide her with a moving truck.

## II.

Al-Dabbi argues that the district court erred in allowing the government to present evidence that he assaulted Lila and that Lila, sensing danger to her life, desired to dispose of his gun. Because Al-Dabbi's attorney failed to object to the introduction of this evidence at trial, we review only for plain error. See U.S. v. Parker, 364 F.3d 934, 943 n.2 (8th Cir. 2004) and Fed. R. Crim. Pro. 52(b). Accordingly, we determine whether "there is an error that is plain and that affects

substantial rights," U.S. v. Smith, 378 F.3d 754, 755 (8th Cir. 2004) (citing United States v. Olano, 507 U.S. 725, 732 (1993)), and reverse only if that error "'seriously affect[ed] the fairness, integrity or public reputation of [the] judicial proceedings.'" Olano, 507 U.S. at 736.

We first determine whether the probative value of the evidence in question is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Ev. 403. "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Old Chief v. United States, 519 U.S. 172, 180 (1997). The danger here is that the jury might judge the defendant for an act other than that with which he is charged. Thus we require that the legitimate value of any such potentially damning evidence bear a certain proportion to this danger. The evidence of violent behavior and handgun possession and of the fear that they occasioned in Lila, a member of the conspiracy, was relevant to proving the conspiracy charge—specifically, to showing Al-Dabbi's attempts to control the conspiracy through the mechanisms of violence and fear. We cannot conclude that the danger of prejudice to Al-Dabbi—that is, whether the jury might have drawn conclusions about his character and judged him on this basis—substantially outweighs the probativeness of this evidence for establishing his participation in and control over the conspiracy. Where matrimonial co-existence blends with co-participation in a drug conspiracy, it is difficult—perhaps impossible—to confine each instance of violence, fear, and intimidation entirely to one sphere or the other. The instances discussed here logically relate to the drug conspiracy, although one could never say with certainty that the relationship is exclusive, for these instances also relate to marital conflict. Yet this logical relationship need not be exclusive in order for the probative value of the evidence to not be substantially outweighed by the danger of unfair prejudice.

-4-

We must also determine whether this evidence was admitted to prove that Al-Dabbi had bad character in order to "show action in conformity therewith." Fed. R. Ev. 404(b). This rule builds on a common-law tradition "disallow[ing] resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt." Old Chief, 519 U.S. at 181 (internal marks omitted). The concern here is that evidence of a defendant's bad acts in the past could be used as proof that he is of evil character, which in turn could be used to show that he committed the crime in question. "This court has often stated that we will overturn the admission of Rule 404(b) evidence only if the appellant can show that the evidence in question clearly had no bearing upon any of the issues involved." United States v. Crenshaw, 359 F.3d 977, 1000 (8th Cir. 2004) (internal marks omitted). The evidence in question was related to the ongoing conspiracy, and there has been no showing that it was introduced to prove character or that it resulted in a conviction on this basis. Furthermore, the dangers of unfair prejudice or misuse of evidence to show bad character and action in conformity therewith are relatively minor in the circumstances of this case. Cf. United States v. Dierling, 131 F.3d 722, 731 (8th Cir. 1997) (noting, in regard to evidence of the display of a severed head to co-conspirators as a method of controlling the conspiracy, that "[a]lthough the slaying evidence was violent and grisly in nature, there was testimony to connect it directly to the drug business of which appellants were accused"); United States v. Johnson, 169 F.3d 1092, 1096-97 (8th Cir. 1999) (allowing testimony about the rape and beating of a woman as relevant to establishing the defendants' drug collection methods in furtherance of a conspiracy to distribute cocaine). Accordingly, we conclude that no plain error occurred in the admission of this evidence.

## III.

Al-Dabbi contends that the government violated his due process rights under Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose before trial that it had promised financial assistance to McCray. Again, since Al-Dabbi did not raise a

Brady claim in the district court, we review only for plain error. See United States v. Greatwalker, 356 F.3d 908, 911 (8th Cir. 2004) (per curiam); Fed. R. Crim. P. 52(b).

Due process requires that the government disclose all evidence that is "favorable to an accused" and "material either to guilt or to punishment." Brady, 373 U.S. at 87. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). "Reasonable probability" means "a probability sufficient to undermine confidence in the outcome." Id. (citing Strickland v. Washington, 466 U.S. 668, 694 (1984)).

We have held that "there is no due process violation under Brady 'as long as ultimate disclosure is made before it is too late for the defendant to make use of any benefits of the evidence.'" United States v. Jones, 101 F.3d 1263, 1272 (8th Cir. 1996) (quoting Nassar v. Sissel, 792 F.2d 119, 121 (8th Cir. 1986)). Al-Dabbi contends that the late disclosure "made it impossible for defense counsel to cross-examine McCray effectively regarding the financial assistance provided to her." Brief for the Appellant, 28. The disclosure did not, however, come too late for Al-Dabbi's counsel to "make use of any benefits of the evidence" disclosed. Nassar, 792 F.2d at 121. The government made its disclosure at the beginning of its direct examination of McCray, thus enabling cross-examination on the subject of the newly disclosed information. While the timing of the disclosure did not afford Al-Dabbi's attorney the benefit of the information in formulating his case, it did provide him with the opportunity to request a continuance or recess of the trial to prepare to cross-examine McCray effectively or otherwise make use of the information. He chose neither course of action. Al-Dabbi contends that a "mere recess could not have cured the violation" and that "[f]urther investigation would have been required," but he fails to substantiate this claim. He also fails to specify why, if the evidence was indeed so important, he made absolutely no use of it. Although we note an element of unfair surprise inherent in the tardiness of this disclosure and do not condone the

-6-

government's conduct in this regard, see Madsen v. Dormire, 137 F.3d 602, 605 (8th Cir. 1998) (commenting in similar circumstances that a "criminal trial should be a quest for truth") (internal marks omitted), we conclude that the late disclosure did not deprive Al-Dabbi of a fair trial.  See Bagley, 473 U.S. at 678.

Even if the government's disclosure had come too late for Al-Dabbi to make use of any benefits of the evidence, his Brady claim would still fail, for the suppressed evidence does not undermine our confidence in the outcome of the trial. The evidence of financial assistance to McCray is at best mildly favorable to Al-Dabbi.  Although the evidence could have been used by Al-Dabbi's attorney to attack McCray's credibility, the jury nonetheless was aware of the financial assistance and of other evidence tending to diminish her credibility.

It is highly unlikely that any cross examination, however skillfully conducted, regarding the details of the financial assistance the government had promised to McCray would have caused the jury to further doubt McCray's credibility.  It is even more unlikely that any potential decrease in McCray's credibility would have affected the outcome of the trial.  McCray was one of five cooperating witnesses who testified for the government.  Additionally, Al-Dabbi's attorney used McCray to discredit other witnesses, including Evans and Christopher Gant.  To make a claim under Brady, the evidence must be more than merely favorable to the defendant; it must also be material.  That is, we would have to find it reasonably probable "that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  Bagley, 473 U.S. 682.  We are not persuaded that this would have been the case.

The judgment is affirmed.

_____