# United States Court of Appeals

## For the Eighth Circuit

_____

No. 15-2865

_____

United States of America

*Plaintiff - Appellee*

v.

Jeffrey Ray Pendleton

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - St. Joseph

_____

Submitted: June 17, 2016
Filed: August 12, 2016

_____

Before SMITH, GRUENDER, and BENTON, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Jeffrey Ray Pendleton was indicted for conspiracy to distribute methamphetamine and conspiracy to commit money laundering. A jury found him

guilty of both charges. Pendleton now appeals, raising several challenges to the district court's[1] rulings. We affirm.

## I.

In August 2012, a grand jury indicted Pendleton for conspiracy to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), (h). An earlier-filed criminal complaint indicated that Pendleton, in the course of this conspiracy, had assaulted one of his co-conspirators. Pendleton moved *in limine* to prevent the Government from using evidence of the assault at trial, but the district court denied his motion.

Pendleton's counsel moved to withdraw, per Pendleton's request, citing lack of communication and disagreement about trial strategy. At a hearing on this motion, Pendleton expressed concern that his attorney was not investigating his case adequately. The magistrate judge denied the motion and declined to appoint new counsel. The court concluded that Pendleton's attorney was fulfilling his professional duties and that any lack of communication between Pendleton and his counsel resulted solely from Pendleton's refusal to discuss the case with his attorney.

Immediately prior to trial, Pendleton's attorney filed a motion under *Brady v. Maryland*, 373 U.S. 83 (1963), in which he sought disclosure of Pendleton's co-conspirators' presentence investigation reports ("PSRs"). After conducting a hearing on the motion and an *in camera* review of the PSRs, the magistrate judge concluded that the PSRs contained no exculpatory information and denied the motion.

---

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri.

During voir dire, the district court informed the venire panel that Pendleton was charged with conspiracy to distribute methamphetime and conspiracy to commit money laundering. The court asked if any members of the panel knew Pendleton or anyone who might be related to him. Venireperson 43 informed the court that she was a bail bondswoman and that she knew "Pendletons that had ties" to the St. Joseph, Missouri area. When the court asked if her knowledge would impact her judgment in the case, the venireperson said, "I'm very aware of the situation and, of course, with the methamphetamines that were being distributed in the Pendleton family." The court cut her off, asking her simply to confirm that her judgment would be impacted. Pendleton did not object, nor did he ask for any curative instruction. However, at the conclusion of voir dire, he asked for a mistrial, arguing that the venireperson's comments had tainted the panel. The court excused the relevant venireperson, but it denied the mistrial motion. The court explained that it had acted quickly to limit the comment and that its questions and instructions to the venire panel repeatedly emphasized the need for jurors to make a decision based only on the evidence at trial.

At trial, two officers testified that they had arrested Pendleton and found him with drug paraphernalia and large amounts of cash. Other witnesses testified that they bought drugs from or sold drugs to Pendleton or that they observed Pendleton engage in high-value methamphetamine transactions. A few witnesses also testified that they sold methamphetamine for Pendleton and gave him the profits. One of these witnesses, R.D., testified that she had been assaulted by Pendleton and his associate because Pendleton believed that R.D. had stolen drugs and money from him. R.D. authenticated photographs depicting the injuries she sustained from this assault.

After the Government presented its case in chief, Pendleton moved for judgment of acquittal. Regarding the money-laundering charge, Pendleton claimed that the Government had failed to prove that he sought to conceal the use of funds derived from drug proceeds. The court denied his motion and submitted the case to

the jury, which found Pendleton guilty. The district court sentenced Pendleton to concurrent sentences of 300 months' imprisonment for the drug-distribution charge and 240 months' imprisonment for the money-laundering charge. Pendleton now appeals.

## II.

Pendleton advances several arguments on appeal. First, he challenges the denial of his motion for disclosure of his co-conspirators' PSRs. Second, he argues that the district court improperly denied his motion for new counsel. Third, he contends that the court abused its discretion when it refused to declare a mistrial after venireperson 43 alluded to extrajudicial knowledge of criminal conduct in the Pendleton family. Fourth, Pendleton argues that the court abused its discretion by admitting evidence of Pendleton's assault of R.D. Finally, Pendleton appeals from the denial of his motion for judgment of acquittal on the money-laundering charge.

## A.

We begin with Pendleton's argument that the court improperly denied the motion for disclosure of his co-conspirators' PSRs. Pendleton contends that the PSRs contained information that could have been used to impeach his co-conspirators, who served as government witnesses during trial. We review the denial of this motion for abuse of discretion. *United States v. DeVore*, 839 F.2d 1330, 1332 (8th Cir. 1988); *United States v. Willis*, 89 F.3d 1371, 1381 n.6 (8th Cir. 1996).

Under *Brady v. Maryland*, "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The prosecution's duty to disclose extends to evidence that may be used to impeach government witnesses. *Giglio v. United States*, 405 U.S.

-4-

150, 154 (1972). However, the Government has no duty to disclose evidence that is neutral, speculative, or inculpatory, or evidence that is available to the defense from other sources. *United States v. Flores-Mireles*, 112 F.3d 337, 340 (8th Cir. 1997). To obtain relief for a *Brady* violation, a defendant must demonstrate prejudice by showing that "'there is a reasonable probability' that the result of the proceeding would have been different if the suppressed documents had been disclosed to the defense." *Strickler v. Greene*, 527 U.S. 263, 289 (1999). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 289-90 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

Generally, a defendant is not entitled to production of PSRs of government witnesses. *United States v. Alvarez*, 358 F.3d 1194, 1209 (9th Cir. 2004); *see also United States v. McKnight*, 771 F.2d 388, 390 (8th Cir. 1985). PSRs are confidential reports created by an arm of the court and designed for use by a judge in reaching a fair sentence. *United States v. Dingle*, 546 F.2d 1378, 1381 (10th Cir. 1976). A court may, in its discretion, make an *in camera* inspection of a PSR if a defendant alleges that the PSR contains material to which he would be entitled under *Brady*. *United States v. Burke*, 425 F.3d 400, 413-14 (7th Cir. 2005); *United States v. Garcia*, 562 F.3d 947, 953 (8th Cir. 2009) (holding that a court abuses its discretion by failing to conduct an *in camera* review of a government witness's PSR when "the defendant has sought access to a coconspirator's PSR, [and] the government has recognized the possibility that the PSR contains *Brady/Giglio* information"). However, PSRs "are not public and should not be disclosed to third persons absent a demonstration that disclosure is required to meet the ends of justice." *McKnight*, 771 F.2d at 390; *see also United States v. Shyres*, 898 F.2d 647, 656 (8th Cir. 1990) (upholding the district court's decision denying disclosure of a witness's PSR where the defendant presented no compelling or substantial need for it).

Pendleton argues that the court erred when it denied his request for the PSRs of two co-conspirators, J.J. and B.B., who cooperated with the Government. According to Pendleton, their PSRs indicate that J.J. and B.B. did not implicate him during their initial statements to police, even though they later named Pendleton as a key player in the drug conspiracy. This inconsistency, Pendleton claims, could be used to impeach their credibility. We reject Pendleton's contention that the district court erred when it determined that such evidence does not fall under *Brady*. First, even if J.J. and B.B. failed to name Pendleton in early statements to police, Pendleton did not allege that these initial interviews included any specific questions about him or his role in the conspiracy. Thus, he has not shown that the witnesses' initial failure to name him undermines their credibility. *See Flores-Mireles*, 112 F.3d at 340 (noting that neutral evidence does not fall under *Brady*). Second, Pendleton's knowledge of the inconsistent statements suggests that he had access to the information from other sources, and *Brady* does not require disclosure in this circumstance, *id.*, particularly when the movant offers nothing more than speculation to support his belief that a PSR contains the relevant information, *see United States v. Mitchell*, 178 F.3d 904, 907-08 (7th Cir. 1999) (noting that mere speculation about the contents of a PSR is insufficient to warrant disclosure under *Brady*).

Pendleton also argues that he is entitled to a new trial under *Brady* because the court, following its *in camera* review, did not require the Government to disclose that the PSRs of T.A. and J.M., two other co-conspirators, contained inconsistent statements about when they began cooperating with police and other details, such as whether T.A. actually accompanied Pendleton to a certain location to sell drugs. Pendleton argues that such inconsistencies could have been used to impeach these co-conspirators. We reject his contention that nondisclosure entitles him to a new trial.

The fatal flaw in Pendleton's argument is his failure to demonstrate prejudice from this nondisclosure. During trial, both T.A. and J.M. acknowledged that they had cooperated with law enforcement in order to receive more favorable treatment in their

own criminal proceedings. In this circumstance, their credibility had been shaken. *Cf. United States v. Shelton*, 588 F.2d 1242, 1248 (9th Cir. 1978) ("Impeachment evidence, even that which tends to further undermine the credibility of the key Government witness whose credibility has already been shaken due to extensive cross-examination, does not create a reasonable doubt that did not otherwise exist where that evidence is cumulative or collateral."). Moreover, the testimony of these two witnesses was not essential to proving Pendleton's guilt because the other evidence of his guilt was overwhelming. *See Giglio*, 405 U.S. at 154 (noting that evidence affecting credibility must be disclosed under *Brady* if the "reliability of a given witness may well be determinative of guilt or innocence" (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959))); *see Dye v. Stender*, 208 F.3d 662, 666 (8th Cir. 2000) (concluding that letters from the prosecuting attorney, which tended to impeach two government witnesses' testimony, were not material when the court found "overwhelming circumstantial evidence of [the defendant's] guilt").[2] Several other witnesses testified that they observed Pendleton carry out drug purchases and sales involving drug quantities valued as high as $10,000. Accordingly, we conclude that the district court did not abuse its discretion when it failed to order disclosure, and we hold that Pendleton is not entitled to relief under *Brady*.

## B.

Pendleton next argues that the court improperly denied his counsel's motion to withdraw and his request for new counsel. Pendleton contends that the court should have granted this motion because a "complete breakdown in communication"

---

[2]In his brief, Pendleton raises a one-sentence argument that the same inconsistent statements constitute newly discovered evidence warranting a new trial. We disagree. *See United States v. Baker*, 479 F.3d 574, 577 (8th Cir. 2007) (discussing motions for a new trial and stating that "newly discovered evidence must be 'more than merely . . . impeaching'" (alteration in original) (quoting *United States v. Dogskin*, 265 F.3d 682, 685 (8th Cir. 2001))).

followed from his counsel's failure to investigate the *Brady* material. *See United States v. Boone*, 437 F.3d 829, 839 (8th Cir. 2006). "We review a district court's denial of counsel's motion to withdraw for abuse of discretion." *Sanford v. Maid-Rite Corp.*, 816 F.3d 546, 549 (8th Cir. 2016). We review the denial of a request for new counsel using the same standard. *Boone*, 437 F.3d at 839.

To obtain new counsel, a defendant must show justifiable dissatisfaction with appointed counsel that arises from difficulties such as "irreconcilable conflict, a complete breakdown in communication, or any other factor interfering significantly with an attorney's ability to provide zealous representation." *Id.* Justifiable dissatisfaction is not established "merely by a defendant's frustration with counsel's performance or disagreement with his tactical decisions." *Id.* Here, we conclude that the court properly determined that Pendleton's complaints did not reveal justifiable dissatisfaction.

At a hearing on the motion, Pendleton stated that he stopped communicating with his attorney because the attorney was not sufficiently investigating his case or pursuing *Brady* material related to government witnesses. However, Pendleton acknowledged that his attorney successfully had sought some *Brady* material. In addition, immediately prior to trial, counsel filed a second motion for disclosure of *Brady* material, one that specifically related to the PSRs Pendleton said that he wanted at the hearing.

Pendleton's attorney informed the court that he was prepared to go to trial despite his professional view that Pendleton should have accepted a plea deal. He also stated that he had gone to see Pendleton more than thirty times in the course of his representation and that he continued to try to speak with Pendleton, even though Pendleton declined to talk to him. Based on this information, the court concluded that Pendleton's counsel performed adequately and that any lack of communication between Pendleton and his counsel did not stem from a complete breakdown in

communication or attorney ineffectiveness but rather from an unwillingness on Pendleton's part to communicate with his counsel. Under such circumstances, a court does not abuse its discretion by refusing to appoint new counsel. *See United States v. Barrow*, 287 F.3d 733, 738 (8th Cir. 2002) (affirming a district court's denial of a defendant's motion for new counsel where "there was no total breakdown in communication, only an unwillingness on [the defendant's] part to communicate with counsel"). Because Pendleton failed to show justifiable dissatisfaction, the court did not abuse its discretion by denying his motion.[3]

## C.

We next turn to Pendleton's contention that the district court abused its discretion when it failed to declare a mistrial after one venireperson said that she was familiar with the Pendleton family and their distribution of methamphetamine. Although the court excused venireperson 43 for cause, Pendleton argues that this action was not sufficient to address the effect of her statement on the forty-six person venire panel. He argues that the court violated his constitutional rights when it allowed the trial to proceed with the empaneled members. *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961).

"Our review of whether the district judge conducted voir dire in a way that protected [a defendant's] Sixth Amendment right to a fair and impartial jury is limited to an abuse of discretion." *United States v. Granados*, 117 F.3d 1089, 1092 (8th Cir. 1997). This deferential standard of review reflects the fact that the district court is

---

[3]In this direct appeal, we decline to consider Pendleton's argument that he received ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). Pendleton has not shown that his case is exceptional, and we therefore conclude that this claim should be raised in a habeas corpus action. *See United States v. Golliher*, 820 F.3d 979, 984 (8th Cir. 2016) (noting that we review *Strickland* claims on direct appeal only in exceptional cases).

in the best position to judge whether the dismissed venireperson's statements are so detrimental as to render the entire venire biased against a defendant. *Arizona v. Washington*, 434 U.S. 497, 514 (1978). After all, the district court, unlike a court of appeals, may "observe the demeanor and response of the prospective jurors and evaluate any possible prejudice." *United States v. Doggett*, 821 F.2d 1049, 1051 (5th Cir. 1987). As we said in *Goldstein v. United States*, "It is impossible to gather from the cold record . . . the atmosphere of the [proceedings], the manner in which the words were spoken, or the probable effect, if any, which they had upon the merits of the controversy." 63 F.2d 609, 613 (8th Cir. 1933).

Here, the record shows that the court carefully considered whether the panel had been tainted by venireperson 43's statement about the Pendleton family. When Pendleton's attorney moved for a mistrial following the conclusion of voir dire, the court explained that it had acted quickly to interrupt venireperson 43 and that it "felt that given the point that [it] cut her off that not only was it clear that [the court] didn't want to hear what her opinions were but it negated any impact that what she was saying or attempting to say might otherwise have." *See United States v. Cantwell*, 41 F. App'x 263, 269 (10th Cir. 2002) (unpublished) (finding no abuse of discretion and noting that the "prospective jurors' remarks were brief and quickly terminated by the district court"). In addition, the court referenced the configuration of the courtroom and the fact that those panel members nearest venireperson 43—presumably, those most likely to have heard her statements—were seated in a row separate from the other prospective jurors and that none of the venire members in venireperson 43's row were ultimately selected as members of the jury. As a result, the court concluded that proper instructions could suffice to eliminate any taint. The court also noted that it had "asked time and time again whether people could decide the case based on the evidence that's presented here and the law as I instructed them and will instruct them" throughout the trial.

The record confirms that the court took these precautions. Following venireperson 43's comment, the court asked the panel whether anyone could not accept the presumption of innocence. The court also inquired as to whether the venire members felt that any other factors would affect their ability to be fair and impartial. Neither question elicited a positive response. In addition, the court instructed the selected jurors at the outset of trial that Pendleton must be presumed innocent and that all conclusions had to be drawn from evidence—that is, "the testimony of witnesses, documents, and other things received as exhibits, any facts that have been stipulated." The court repeated these instructions after the trial, also telling the jurors that they must not carry out independent investigation or research in order to avoid being influenced by "inaccurate, incomplete, or misleading information that has not been tested by the trial process."

We presume that juries follow a court's instructions. *Conley v. Very*, 450 F.3d 786, 788 (8th Cir. 2006). This presumption applies even when a potential juror refers to having some extrajudicial knowledge of a defendant's criminal conduct. For example, our court upheld the denial of a mistrial motion after a potential juror, when asked if he knew any of the defendants, said that one of the defendants had "shot [his] son." *United States v. Wade*, 467 F.2d 1226, 1228 (8th Cir. 1972). Our court determined that the statement did not irreparably damage the fairness of the trial in large part because the court instructed the jury to disregard the statement and because "[t]he court did all that could be done to obtain all information possible to aid it in its determination of whether the juror's statement would deprive defendants of a fair and impartial trial." *Id.*; *see also Butler v. United States*, 351 F.2d 14, 17, 19-20 (8th Cir. 1965) (rejecting a defendant's contention that the court denied his right to a fair trial when it retained the venire panel and instructed the jury to disregard a prospective juror's statement that she worked with victims who suffered "a lot of trouble" because of the defendant's actions).

Our sister circuits similarly have relied on the curative effect of proper instructions in cases involving errant venireperson statements. For example, in *United States v. Ortiz-Martinez*, the Ninth Circuit upheld a district court's decision to retain a panel after one venireperson said that she had seen news stories related to charges of bribery against Customs and Border Protection officers, that the stories might have been about the defendant, and that she consequently suspected the defendant was guilty. 593 F. App'x 649, 650 (9th Cir.) (unpublished), *cert. denied*, 576 U.S. ---, 135 S. Ct. 2912 (2015). The Ninth Circuit explained that these statements were not irreparably damaging and thus found it sufficient that the district court had "emphasized several times that jurors were required to decide the case solely on the basis of the evidence presented in the courtroom, and [the district court] gave several strong admonitions regarding the presumption of innocence and the requirement of proof beyond a reasonable doubt." *Id.*; *cf. Mach v. Stewart*, 137 F.3d 630 (9th Cir. 1997) (concluding that the court, at minimum, should have conducted further voir dire to determine whether the panel had been infected after a prospective juror employed as a social worker made several expert-like statements suggesting that child victims do not lie in sexual assault cases like the one at hand).

Similarly, in *United States v. Moutry*, the Seventh Circuit rejected a defendant's contention that the district court plainly erred when it proceeded with the panel even after one venireperson—a pharmacist—"advised the court that he thought he recognized [one of the defendants on trial for drug crimes] as someone who might have attempted to pass a fraudulent prescription in one of the pharmacies where he worked." 46 F.3d 598, 602 (7th Cir. 1995). Although the venireperson suggested that the defendant might be someone who he knew "use[d] drugs," the Seventh Circuit rejected the defendant's contention that the court plainly erred by not striking the venire panel, in part because each juror had agreed that he or she could consider the case fairly and impartially after hearing this comment. *Id.* at 603. The court also noted that the defendant presented "nothing to indicate that any one of the jurors was less than truthful about his or her ability to be fair and impartial, or that any of the

jurors otherwise harbored a prejudice against the defendant." *Id.* Relying on the jury's promise to remain impartial and commenting on the strength of the evidence at trial, the Seventh Circuit upheld the court's decision to proceed with the panel. *Id.*

Finally, in *United States v. Carson*, the Seventh Circuit determined that the court did not abuse its discretion when it retained the venire panel after a potential juror said that one of the defendants on trial for possession of a firearm as a felon had held a pistol near the venireperson's face several years before. 9 F.3d 576, 588, 590 (7th Cir. 1993), *superceded by statute on other grounds as recognized in Unites States v. Fones*, 51 F.3d 663 (7th Cir. 1995). The Seventh Circuit noted that the court "did an able job of minimizing the prejudicial effect of [the] unfortunate remarks without drawing undue attention to them." *Id.* at 589. The court explained that the district court had given the panel members the opportunity to state whether they could be impartial, and it advised the panel to decide the case based only on the evidence. *Id.* In rejecting the defendant's appeal contending that the court abused its discretion, the Seventh Circuit explained that it did not wish to adopt a standard that would burden the courts with starting over any time a prospective juror revealed extrajudicial knowledge that would affect his or her view of a defendant's guilt. *Id.*

These cases reveal that there is no bright-line rule that a court must dismiss the entire venire panel whenever a venireperson alludes to having outside knowledge of a defendant's criminal activity. As the Fifth Circuit stated in *Doggett*, statements from a prospective juror indicating actual or media-based knowledge of the underlying events are "grist for the mill of any voir dire inquiry in any criminal charge which involves someone at least minimally well known in the community." 821 F.2d at 1051. Requiring the court inflexibly to start over again with a new venire panel every time—regardless of the nature, credibility, brevity, or volume of the statement—is a "burden [that] cannot be placed upon the criminal processes and the selection of a jury." *Id.* We think this is particularly true when, as here, the

defendant's counsel failed to request that the panel be stricken until the end of voir dire.

Here, the court, having heard the statement and sitting in the best position to observe the panel, concluded that the damage was not irreparable and that the court's questions and instructions would suffice to protect Pendleton's constitutional rights. Pendleton did not ask for any additional curative instruction, either at the time of the comment or at the conclusion of voir dire. And when the court offered to explore the impact of the statement at the conclusion of voir dire, Pendleton's counsel asked that the court not do so, stating that he did not want the court to draw attention to the comment. *See United States v. Lussier*, 423 F.3d 838, 842 (8th Cir. 2005) (finding no abuse of discretion in the court's decision to retain the panel where the court offered curative measures, which the defendant rejected as "cures worse than the disease"). Pendleton's attorney ultimately informed the court that, while he was "not giving up" his objection, he was "confident with the Court's instruction going forward that we can constitute the jury as [the court] ha[d] seen it given the strikes" the court could use to dismiss potential jurors. Under these facts and the deferential standard of review, we cannot conclude that the district court abused its discretion when it proceeded with the venire panel.

D.

Pendleton also argues that the court abused its discretion by admitting evidence that Pendleton was involved in the assault of a co-conspirator, R.D. He contends that the evidence was both irrelevant to his charges and unduly prejudicial. *See* Fed. R. Evid. 401, 403. "We review a district court's evidentiary rulings for abuse of discretion." *United States v. Never Misses A Shot*, 781 F.3d 1017, 1027 (8th Cir. 2015).

-14-

The evidence at issue consists of testimony from a co-conspirator, R.D., that Pendleton ordered and participated in her assault after another co-conspirator accused her of taking methamphetamine, money, and a DVD player. R.D. explained that she had been involved in selling methamphetamine that she obtained from Pendleton. She said that another member of the conspiracy accused R.D. of taking the drugs and money owed to Pendleton, a theft that compromised Pendleton's ability to buy additional methamphetamine. R.D. also explained that Pendleton ordered her into the basement at a party, hit her, told another co-conspirator to hit her, and then forced her to insert a hypodermic needle into her arm. Finally, R.D. testified that someone took photographs of her injuries following this beating, and she authenticated the pictures presented by the Government and offered into evidence.

In reviewing Pendleton's claim that the assault evidence was irrelevant, we note that the facts of this case are close to those at issue in *United States v. Gasim Al-Dabbi*, 388 F.3d 1145 (8th Cir. 2004), *cert. granted, judgment vacated on other grounds sub nom. Adil Gasim Al-Dabbi v. United States*, 546 U.S. 973 (2005). There, a defendant convicted of conspiracy to distribute cocaine argued that a district court plainly erred by admitting evidence that the defendant violently assaulted his co-conspirator. *Id.* at 1148. We rejected this contention, noting that such evidence "was relevant to proving the conspiracy charge—specifically, to showing [the defendant's] attempts to control the conspiracy through the mechanisms of violence and fear." *Id.* The same logic applies here. Pendleton's defense at trial was that the evidence established only that he was a mere user of methamphetamine and that every witness who implicated him in a larger conspiracy to sell drugs lied to the jury. The evidence of R.D.'s assault refuted this theory because Pendleton's orchestration of and participation in the assault as reprisal for R.D.'s alleged thefts of drugs and money showed that he was involved, and indeed a key figure, in the drug-distribution scheme. *See* Fed. R. Evid. 401; *United States v. Mora*, 81 F.3d 781, 783 (8th Cir. 1996) ("Relevance of evidence 'is established by any showing, however slight, that the evidence makes it more or less likely that the defendant committed the crime in

question.'" (quoting *United States v. Casares–Cardenas*, 14 F.3d 1283, 1287 (8th Cir. 1994))); *cf. United States v. Donnell*, 596 F.3d 913, 920 (8th Cir. 2010) (finding no abuse of discretion when the district court admitted audio recordings in which the defendant referred to his violent conduct because the statements showed his role within the drug conspiracy was that of an enforcer).  In addition, the photographs were relevant because they supported R.D.'s credibility on the issue of whether she actually had been assaulted, and they showed the extent of the injuries she sustained.  *See United States v. One Feather*, 702 F.2d 736, 739 (8th Cir. 1983) (upholding admission of photographs of an injury in part because they assisted the jury in evaluating the witness's credibility).

Although Pendleton contends that the prejudicial effect of the evidence substantially outweighed its probative value, *see* Fed. R. Evid. 403, we see no abuse of discretion on this basis.  "[A] district court is granted broad discretion in determining whether the admission of contested evidence could result in the possibility of unfair prejudice." *Never Misses A Shot*, 781 F.3d at 1027.  We afford great deference to the court's balance of the prejudicial and probative impact of evidence. *Id.*  Here, the photographs were not unduly gruesome; they depicted the co-conspirator's bruises and a cut lip. *See, e.g.*, *United States v. Davidson*, 122 F.3d 531, 538 (8th Cir. 1997) ("[A] trial court has discretion to admit a relevant photograph unless it is 'so gruesome or inflammatory that its prejudicial impact substantially outweigh[s] its probative value.'" (quoting *United States v. Petary*, 857 F.2d 458, 463 (8th Cir. 1988))); *United States v. Kime*, 99 F.3d 870, 878 (8th Cir. 1996) (determining that photographs depicting a gunshot wound and head injuries were not "particularly prejudicial as unduly gruesome or confusing").  Finally, we note that the court instructed the jury that Pendleton was on trial "only for the crimes charged, not for anything else."  Because we assume that the jury follows instructions, we conclude that the instruction mitigated the danger that the jury would convict Pendleton of the charged crimes solely based on his assault of R.D.  *See United States*

*v. Ali*, 799 F.3d 1008, 1028 (8th Cir. 2015) (noting that a court may diminish the danger of unfair prejudice through jury instructions).

E.

Finally, Pendleton argues that the district court improperly denied his motion for judgment of acquittal on the money-laundering charge because the evidence was insufficient to support his conviction. "We review the sufficiency of the evidence de novo, viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." *United States v. Lockett*, 601 F.3d 837, 840 (8th Cir. 2010) (quoting *United States v. Washington*, 318 F.3d 845, 852 (8th Cir. 2003)). We will affirm the verdict "if any rational jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Ojeda-Estrada*, 577 F.3d 871, 874 (8th Cir. 2009).

Conviction for money laundering under § 1956(a)(1)(A) requires the Government to prove that the defendant, "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(A)(i); *see United States v. Cruz*, 993 F.2d 164, 167 (8th Cir. 1993). On appeal, Pendleton contends that the evidence presented by the Government did not show that he engaged in financial transactions in order to promote the carrying on of specified unlawful activity.[4]

_____

[4]The ground Pendleton raises on appeal regarding the sufficiency of the evidence differs from the ground raised in his motion for judgment of acquittal during trial. During trial, Pendleton argued that the Government had not shown that he attempted to conceal his use of funds derived from the drug operation. The Government responded, and the court correctly found, that this argument goes only

-17-

However, this argument is directly rebutted by the evidence presented at trial. Several witnesses, including R.D. and J.C., another co-conspirator, explained that Pendleton had used his methamphetamine-sale profits to purchase additional methamphetamine. Accordingly, there was sufficient evidence for a jury to find that Pendleton engaged in financial transactions in order to promote the carrying on of specified unlawful activity. *See United States v. King*, 169 F.3d 1035, 1039 (6th Cir. 1999) (collecting cases showing that payment for drugs may constitute promotion for the purposes of the money laundering statute when such payment encourages further drug transactions). The court properly denied Pendleton's motion for judgment of acquittal.

III.

For the foregoing reasons, we affirm.

_____

to one method of proving money laundering, a method that the Government did not pursue. *Compare* 18 U.S.C. § 1956(a)(1)(A) (not requiring proof of attempted concealment) *with* § 1956(a)(1)(B)(I) (requiring proof of attempted concealment). Normally, our court would conclude that Pendleton forfeited the argument he now raises on appeal regarding sufficiency. *See United States v. Calhoun*, 721 F.3d 596, 600 (8th Cir. 2013). However, the Government does not assert forfeiture and instead argues for *de novo* review on the merits. Thus, we choose to apply the usual standard for evaluating the sufficiency-of-the-evidence claim. *See United States v. Kelly*, 625 F.3d 516, 518 (8th Cir. 2010).