# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-3683
_____

United States of America

*Plaintiff - Appellee*

v.

Chad Eric Mink, also known as Chad Mink

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Southern District of Iowa - Davenport
_____

Submitted: March 16, 2021
Filed: August 12, 2021
_____

Before SHEPHERD, ERICKSON, and KOBES, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

A jury found Chad Eric Mink guilty on all counts of a 15-count indictment, and the district court sentenced him to 600 months imprisonment. Mink appeals his convictions and sentence. Having jurisdiction under 28 U.S.C. § 1291, we vacate Mink's conviction on Count 8, affirm his convictions on the remaining counts, and vacate his sentence in its entirety so that the district court may reconfigure Mink's sentencing plan to guarantee that his sentence satisfies the 18 U.S.C. § 3553 factors.

"We recite the facts in the light most favorable to the jury's verdict." United States v. Galloway, 917 F.3d 631, 632 (8th Cir. 2019) (citation omitted).

This case arises out of Mink's incessant and extreme harassment of his ex-girlfriend, L.L., and her partner, D.B., after Mink and L.L.'s relationship ended in 2013.[1] The events began on October 11, 2013, when Mink allegedly stabbed L.L. in the ear with a fork while she was asleep. Mink told law enforcement that L.L. had been drinking and must have fallen on the fork, but a preliminary breath test revealed L.L.'s blood alcohol concentration to be 0.000. On November 14, 2013, D.B. discovered that someone had vandalized his car while parked at "Group O," an Illinois business where D.B. and L.L. worked. That same day, L.L. noticed a strong odor in her house: someone had placed mothballs near the furnace and blocked the exhaust pipe with plumber's putty. The following day, a Group O employee witnessed a red box truck drive around the business and leave. That evening, as L.L. and D.B. were returning from their break together, that same truck collided with D.B.'s car, damaging the driver's side. The truck entered a nearby field, and the driver fled the scene on foot. Responding to the incident, law enforcement stopped a nearby van. Mink was in the backseat wearing wet, muddy clothes and Adidas-brand shoes, matching the shoe impressions taken near the abandoned truck. Mink told law enforcement that he had been walking home from a nearby bar and called the van's driver for a ride. Later, Mink changed his story, telling law enforcement that he had permission to drive the box truck; however, subsequent investigation revealed that the truck had been stolen from a Davenport business. A day later, on November 16, 2013, L.L.'s sister discovered a "pipe bomb"—a steel pipe with endcaps containing an oily residue, a balloon, and some aluminum foil—in the backseat of her car. After this incident, L.L. moved with D.B. from her Milan, Illinois residence to Davenport, Iowa, near the Holy Family Cemetery (HFC).

---

[1]Prior to the events at issue, Mink had been convicted of multiple felonies in Illinois, including burglary in 1991, 1994, 1997, and 2007; unlawful use of weapons by a felon in 1994; and arson in 1994.

Mink was employed at "Fol-Da-Tank," a Milan, Illinois business. One of Mink's coworkers, a Leclaire, Iowa resident, kept a Springfield XD .45 caliber semi-automatic pistol in his truck and claimed that Mink was aware of the pistol. The coworker later reported the pistol missing. On November 18, 2013, Mink reported that his van was shot at while driving to work and told law enforcement that he suspected D.B. had been the shooter, among other possible suspects. Law enforcement later recovered two Hornady "Zombie Max" .45 caliber bullets from Mink's van. Mink subsequently told another individual that he shot his own van, blamed it on D.B., and buried the pistol.

On April 14, 2014, a groundskeeper at Rock Island High School, located in Rock Island, Illinois, discovered a white trash bag containing 19 books, including:

> The Anarchist Cookbook;
> The Anarchist Arsenal: Improvised Incendiary and Explosives Techniques;
> Black Medicine: The Dark Art of Death;
> Black Medicine Volume II: Weapons at Hand;
> Black Medicine Volume III: Low Blows;
> Black Medicine Volume IV: Equalizers;
> Serial Killers and Murderers;
> The Hayduke Silencer Book: Quick and Dirty Homemade Silencers;
> Homemade Semtex: C-4's Ugly Sister;
> Homemade C-4: A Recipe for Survival;
> How to Build Practical Firearm Suppressors: An Illustrated Step-by-Step Guide;
> How to Create a New Identity;
> How to Disappear Completely and Never Be Found;
> How to Make Disposable Silencers: A Complete Guide;
> How to Make Disposable Silencers Volume II: A Complete Illustrated Guide;
> Improvised Munitions Black Book Volume 3;
> New I.D. in America: How to Create a Foolproof New Identity;
> Privacy: How to Get It. How to Enjoy It; and
> Ragnar's Homemade Detonators: How to Make 'Em, How to Salvage 'Em, How to Detonate 'Em.

R. Doc. 220, 70-80. These books contained information such as how to build pipe bombs and other explosives, how to create a silencer, and how to puncture the ear in such a way that causes severe pain. A fingerprint examiner determined that one of the latent fingerprints discovered on the books was left by Mink, and Mink later admitted to law enforcement that the books were his and that he had read them.

On March 19, 2015, a man was searching for shed deer antlers at HFC when he discovered a blue drawstring backpack. Upon inspecting the bag, the man identified what he believed to be pipe bombs inside. The man notified law enforcement, and the Quad City Bomb Squad responded to the scene. Subsequent investigation determined that the backpack contained three 12-inch, galvanized steel pipes with 1.25-inch endcaps, which were drilled for the insertion of a fuse. One pipe had a set of alternating nails attached by colored rubber bands and black zip ties and was additionally wrapped with a strand of more than 200 hex nuts. This pipe further contained a circuit board, an Estes-brand model rocket igniter system, and a black powder—presumably Pyrodex, an explosive substance recovered from a Ziplock bag in the backpack. A subsequent laboratory examination established that the pipes were destructive devices. Law enforcement also discovered in the backpack six rounds of Hornady "Zombie Max" .45 caliber ammunition, one expended cartridge casing of the same ammunition, and a white trash bag matching the one containing the 19 books. On April 5, 2019, a "treasure hunter," who canvassed public areas with a metal detector, discovered a .45 caliber pistol wrapped in black garbage bags and duct tape buried near Rock Island High School. Law enforcement later determined that the pistol was Mink's coworker's missing pistol, although the original barrel had been replaced with an "after-market" barrel.

L.L. and D.B. eventually moved to another Davenport residence, but after that residence was burglarized, the couple moved into Room 120 at the Quad City Inn in Davenport. On February 21, 2016, a motel employee discovered two pipe bombs between Rooms 119 and 120. The pipe bombs were 12-inch, galvanized steel pipes with endcaps and resembled those discovered at HFC, likewise containing Pyrodex and sets of alternating nails held together by colorful rubber bands and zip-ties. L.L.

told law enforcement that she had seen Mink in the motel parking lot earlier. Subsequent investigation revealed that Mink had rented a blue, 2015 Chevrolet Spark at the Quad City Airport in Moline, Illinois, on February 20, 2016. Video surveillance from surrounding businesses showed a blue Chevrolet Spark, or a similar car, driving near the Quad City Inn around 10:00 pm that night. On the afternoon of February 21, 2016, when the bomb was discovered, Mink and a friend drove the Chevrolet Spark to Milan, Michigan, where Mink was to self-report the following day to Federal Correctional Institution, Milan (FCI Milan) for an unrelated 2016 conviction. That evening, Mink sent the following email to the City of Davenport:

> From: Nomen Nescio [mailto:nobody@dizum.com]
> Sent: Sunday, February 21, 2016 10:44 PM
> To: City of Davenport Web E-mail
> Subject:
>
> Me n [D.B.] made a cuuple of bombs just playing arond we never intended to hurt anyone. D forgot to put the bomb away. We set off a couple when we were getting fish one night and by the qc inn. We accidently forgot one over by the miss fairgrounds. I didn't know the serious of what we were doing until I read about it. I woold come forward but will i be charged?.

R. Doc. 224, at 46. Mink admitted to law enforcement that he sent this email, although he later denied doing so at trial. Further investigation of Mink's laptop revealed that it had been used on February 21, 2016, to access news articles concerning the Quad City Inn bombs and the Davenport Emergency Services Team page. R. Doc. 219, at 351. In the past, the laptop had also been used to view pages such as: "Estes Alpha III model rocket starter set construction video"; "Paladin Press," a publisher of books similar to those found at Rock Island High School; "How to Track Down Anyone Online"; "DEADLIEST POISONS"; and "How to Vanish with a New Identity." See R. Doc. 219, at 313-50.

On February 24, 2016, law enforcement met with R.S., an individual who lived with Mink's mother until her passing in 2013. R.S. surrendered to law enforcement a safe that Mink had given him prior to reporting to FCI Milan. The safe contained a magazine loader for a firearm, a lockpick set, and a Solvent Trap Adaptor, which can be used to attach a silencer to a firearm. That same day, law enforcement met with the individual who accompanied Mink to FCI Milan in the rental car. The individual provided law enforcement with Mink's backpack, which included Mink's laptop, a vehicle tracking device, and Mink's wallet. The wallet contained a Metabank debit card. Metabank records disclosed that the card was opened under Mink's email address, physical address, and phone number; however, the name, birthdate, and social security number associated with the card belonged to a Bettendorf, Iowa resident, T.S. Mink was familiar with but had not met T.S., nor had he been authorized to open an account using T.S.'s information. Mink used the card to purchase two Springfield XD 4.7-inch threaded replacements ("after-market" barrels) and a Solvent Trap Adapter. Mink also used the card and T.S.'s information to purchase online services from PeopleFinders.

On March 11, 2016, Mink called Donald Stevens, his biological father, from FCI Milan. Mink directed Stevens to retrieve an item from Mink's jacket, which Mink had left at Stevens's residence. Mink then directed Stevens to destroy the item and to scatter the pieces around the neighborhood. Stevens did as Mink instructed. Stevens later testified that he believed the item was a detonator. On April 18, 2016, Mink again called Stevens and asked him to sign a prewritten affidavit establishing an alibi for Mink, see R. Doc. 224, at 107-10, to which Stevens responded that such an affidavit would be "perjury." Additionally, Mink sent three letters to Stevens, one of which asked Stevens to take blame for Mink's conduct in order to "throw a big monkey wrench" in the government's case. See R. Doc. 224, at 76-77.

On December 14, 2016, a Fol-Da-Tank employee discovered a pistol barrel tucked behind some insulation in the company's walls. The serial number on the barrel matched the Springfield XD .45 caliber semi-automatic pistol reported missing by Mink's coworker. Containers of dimethyl sulfoxide (DMSO) and zinc

phosphide, a compound commonly used in rat poisoning, were also discovered in the walls.

On November 8, 2017, a grand jury returned a 15 count indictment, charging Mink with: one count of interstate transportation of a stolen motor vehicle in violation of 18 U.S.C. §§ 2312 and 2 (Count 1); two counts of stalking in violation of 18 U.S.C. § 2261A (Counts 2 and 9); two counts of interstate domestic violence in violation of 18 U.S.C. § 2261(a)(1) (Counts 3 and 10); two counts of receipt and possession of an unregistered destructive device in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871 (Counts 4 and 12); two counts of being a prohibited person in possession of an unregistered destructive device in violation of 18 U.S.C. §§ 842(i) and 844(a) (Counts 5 and 13); one count of fraudulent use of a means of identification of another person in violation of 18 U.S.C. § 1028(a)(7) (Count 6); one count of malicious use of explosive materials in violation of 18 U.S.C. § 844(i) (Count 7); one count of possession of a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A) (Count 8); one count of using explosive materials during the commission of a federal felony in violation of 18 U.S.C. § 844(h) (Count 11); one count of tampering with a witness in violation of 18 U.S.C. § 1512(b)(2)(B) (Count 14); and one count of obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2) (Count 15). Counts 1-3 concerned the stolen box truck and subsequent vehicular assault; Counts 4-5 concerned the pipe bomb discovered at HFC; Count 6 concerned Mink's unlawful use of T.S.'s means of identification; Counts 7-13 concerned the pipe bombs discovered at the Quad City Inn; and Counts 14-15 concerned Mink's obstruction of justice. Mink pled not guilty on all counts.

Before trial, Mink stipulated that, prior to the conduct alleged in the indictment, he "had been convicted of a crime punishable by a term of imprisonment exceeding one year." R. Doc. 221, at 53. Mink moved to sever counts in the indictment for trial pursuant to Federal Rules of Criminal Procedure 8(a) and 14. Based on the timing of the alleged conduct, Mink argued that the indictment should be severed as follows: Counts 1-3; Counts 4-5; Count 6; and Counts 7-15. The

district court denied Mink's motion, finding that the counts described a common motive, plan, and preparation. Mink also filed motions in limine to exclude evidence of the uncharged conduct, i.e., the vandalism of D.B.'s car, the placement of putty in L.L.'s exhaust pipe, the placement of the pipe bomb in L.L.'s sister's car, and the theft of Mink's coworker's firearm. The district court found that this evidence provided context and was circumstantial evidence of the charged conduct, and it accordingly denied the motion. Mink also filed a motion in limine to exclude evidence of his incarceration at FCI Milan. The district court denied Mink's motion because it found that such evidence would be material to the obstruction of justice charge but noted that it would "use strong and appropriate limiting instructions in an attempt to cure potential unfair prejudice as a result of this evidence." R. Doc. 152, at 3. After the parties rested their cases at trial, Mink moved for a judgment of acquittal; the district court denied the motion and submitted the matter to the jury. The jury convicted Mink on all counts. The district court sentenced Mink to 120 months imprisonment on each of Counts 1-5, 9-10, and 12-13; 60 months imprisonment on Count 6; and 240 months imprisonment on each of Counts 7 and 14-15; all of which were to run concurrently. The district court sentenced Mink to 360 months imprisonment on Count 8, to run consecutively to Count 7, and 120 months imprisonment on Count 11, to run consecutively to Counts 9 and 10. This resulted in a total term of 600 months imprisonment. Mink appeals his conviction and sentence on multiple grounds.

II.

Mink asserts that venue was improper in the Southern District of Iowa as to Count 6. "[I]mproper venue can be waived," United States v. Morrissey, 895 F.3d 541, 550 (8th Cir. 2018) (citation omitted), and Mink did not raise the issue before the district court. However, the record does not indicate that Mink made any affirmative waiver of this argument, so we view the failure to raise the issue as inadvertent. Compare United States v. McCorkle, 688 F.3d 518, 522 (8th Cir. 2012) (treating defendant's failure to challenge venue below as inadvertent when the record did not indicate that he "expressly or intentionally abandoned his right to

object to venue") with Morrissey, 895 F.3d at 550-51 (finding that defendant waived the issue of venue when he declined a jury instruction on venue and stated that it was not at issue).  Therefore, we construe such inadvertent failure as forfeiture and review the challenge on appeal for plain error.  See McCorkle, 688 F.3d at 522.  Accordingly, Mink "must show that there was an error, the error is clear or obvious under current law, the error affected [his] substantial rights, and the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  Id. (citation omitted).

"'Proper venue is required by Article III, § 2 of the United States Constitution and by the Sixth Amendment, as well as Rule 18 of the Federal Rules of Criminal Procedure.'  A federal crime may be prosecuted in any district in which such offense began, continued, or was completed."  United States v. Banks, 706 F.3d 901, 904 (8th Cir. 2013) (citations omitted).  The *locus delicti*, or the place of the wrong, "must be determined from the nature of the crime alleged and the location of the act or acts constituting it."  United States v. Cabrales, 524 U.S. 1, 6-7 (1998) (citation omitted).  "In performing this inquiry, a court must initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts."  United States v. Rodriguez-Moreno, 526 U.S. 275, 279 (1999).  As such, only "essential conduct elements," rather than "circumstance element[s]," may serve as the basis for venue.  See id. at 280 & n.4; see also United States v. Auernheimer, 748 F.3d 525, 533 (3d Cir. 2014).  "Venue ordinarily is a question of fact for the jury and must be instructed upon if in issue."  United States v. Jaber, 509 F.3d 463, 466 (8th Cir. 2007).  The government must establish venue "by a preponderance of the evidence."  Morrissey, 895 F.3d at 550.

Here, the jury was instructed to find whether the "offenses charged were begun, continued or completed in the Southern District of Iowa," R. Doc. 207, at 18, and "[a] jury is presumed to follow its instructions," United States v. Thomas, 877 F.3d 1077, 1079 (8th Cir. 2017) (citation omitted).  Mink nonetheless argues that the jury could not have found that venue was proper as to Count 6 because he applied for, received, and used the fraudulent debit card in Illinois.  Mink's argument fails

as a matter of law. Mink was charged with fraudulently using the means of identification of another person with the intent to commit another felony under 18 U.S.C. § 1028(a)(7), which states:

> Whoever . . . knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law . . . shall be punished as provided in . . . this section.

Mink argues that the essential conduct elements of the offense are confined to the transfer, possession, and use of the means of identification and that all those events—Mink's application, receipt, and use of the fraudulent debit card—occurred in Illinois. However, to prove the charged § 1028(a)(7) violation in Mink's case, the government was required to show that Mink used the means of identification "with the intent to commit, or to aid or abet, or in connection with" a felony. The grand jury charged Mink with the predicate felony of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Accordingly, § 1028(a)(7) has "two distinct conduct elements": (1) the transfer, possession, or use of a means of identification of another person; and (2) as relevant to Mink's case, that he was a felon in possession of a firearm. See Rodriguez-Moreno, 526 U.S. at 280 (finding that a predicate felony was an essential conduct element for venue purposes when the government was required to show that the defendant committed the charged crime "during and in relation to" the predicate felony (citation omitted)); id. ("That the [predicate felony] element of the statute is embedded in a prepositional phrase and not expressed in verbs does not dissuade us from concluding that [the predicate felony] [is an] essential conduct element[].").

Therefore, venue is proper not only in any district where Mink used the means of identification *but also* in any district where he illegally possessed the firearm. The jury was permitted to find that venue was proper in the Southern District of Iowa on either basis. Even if Mink's use of the means of identification did not support the

jury's venue determination, he offers no argument with respect to the predicate felony.  Cf. United States v. Boyle, 700 F.3d 1138, 1143 (8th Cir. 2012) ("[W]hen one theory of conviction is supported by sufficient evidence and another is not, a reviewing court presumes that the jury convicted on the supported theory.").  Because Mink challenges only one of the two possible bases for the jury's determination, his argument "fails as a matter of law[,] and we have no basis for overturning the jury's finding that venue was proper in the Southern District of Iowa."  Cf. United States v. Nguyen, 608 F.3d 368, 374 (8th Cir. 2010) (upholding the jury's verdict in a conspiracy charge when defendant failed to challenge other bases for the jury's finding).

III.

Mink contends that various counts of his conviction are multiplicitous of others in violation of the Double Jeopardy Clause of the Fifth Amendment.  See United States v. Sandstrom, 594 F.3d 634, 651-52 (8th Cir. 2010).  Specifically, he argues that Count 7 is multiplicitous of Count 11, Count 9 is multiplicitous of Count 10, and Counts 4 and 12 are multiplicitous of Counts 5 and 13.  However, Federal Rule of Criminal Procedure 12(b)(3)(B)(ii) requires defendants to raise multiplicity challenges before trial "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits."  Fed. R. Crim. P. 12(b)(3)(B)(ii); see also United States v. Bravebull, 896 F.3d 897, 899 (8th Cir. 2018).  Here, Mink challenges the multiplicity of the counts only on the basis that the statutes require proof of identical elements in violation of Blockburger v. United States, 284 U.S. 299 (1932).  See Sandstrom, 594 F.3d at 654.  Because this legal challenge to the indictment could have been asserted and decided before a trial on the merits, it is untimely and accordingly waived unless Mink can "show[] good cause for the tardiness."  Bravebull, 896 F.3d at 899; see also United States v. Fry, 792 F.3d 884, 888 (8th Cir. 2015).  Mink "has not shown good cause, so we decline to address [his] argument."  See Bravebull, 896 F.3d at 899.

## IV.

Next, Mink contends that, pursuant to Federal Rule of Criminal Procedure 8(a), the government was required to have charged Counts 1-3 through a separate indictment. "We review *de novo* a decision to join counts together into a single indictment." United States v. Colbert, 828 F.3d 718, 728 (8th Cir. 2016) (citation omitted). Joinder of offenses under Rule 8(a) is permissible when multiple offenses "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Id. (quoting Fed. R. Crim. P. 8(a)). "The propriety of joinder is . . . determined from the face of the indictment." United States v. Reichel, 911 F.3d 910, 915 (8th Cir. 2018) (alteration in original) (citation omitted). "The rule is broadly construed in favor of joinder to promote judicial efficiency." United States v. Madkiff, 614 F.3d 431, 439 (8th Cir. 2010) (citation omitted).

Here, Mink argues that Counts 1-3—involving the stolen box truck and subsequent vehicular assault—share nothing in common with the remaining counts except that L.L. and D.B. were the victims and Mink was the alleged perpetrator. He contends the government's theory that Mink engaged in a common scheme to harass L.L. and D.B. rested on evidence later presented at trial rather than on the face of the indictment. However, "[t]he government is not required to put on a full court press on the evidence" for the counts to be properly joined at the outset. United States v. McCarther, 596 F.3d 438, 442 (8th Cir. 2010). The indictment sufficiently connected the counts together with recurring dates, similar conduct and victims, and references to other counts. While the indictment did not explicitly allege a common scheme, we find that the multiple alleged offenses were properly connected by these common characteristics into a common scheme or plan to harass, stalk, or otherwise harm L.L. and D.B. in satisfaction of Rule 8(a). Counts 1-3 fall within that common scheme or plan. Accordingly, we find that the district court did not err in permitting joinder of the offenses.

Additionally, Mink argues that severance under Federal Rule of Criminal Procedure 14(a) was necessary to prevent prejudice. As stated in his motion to sever, Mink argues that the indictment should have been severed as follows: Counts 1-3; Counts 4-5; Count 6; and Counts 7-15. See R. Doc. 36, at 2-3. "Rule 14 allows for severance at trial if joinder 'appears to prejudice a defendant.'" Reichel, 911 F.3d at 915 (quoting Fed. R. Crim. P. 14(a)). "We review a district court's denial of a severance motion for abuse of discretion, and 'we will reverse only when that abuse of discretion results in severe or clear prejudice.'" Colbert, 828 F.3d at 728 (citation omitted).[2] Severe or clear prejudice requires that a defendant show that he "would have had 'an appreciable chance for an acquittal' in a severed trial." Reichel, 911 F.3d at 915 (citation omitted). "No prejudice results from the refusal to sever when evidence of one charge would be admissible in a separate trial on the other. Finally, there is a strong presumption against severing properly joined counts." McCarther, 596 F.3d at 442 (citation omitted).

Here, Mink cannot overcome the strong presumption against severance because evidence of each charge would be admissible against him in a separate trial for another charge. He argues that each independent charge layers bad conduct against him in violation of the Federal Rules of Evidence 403 and 404(b). However, under Rule 404(b), evidence of past bad acts is nonetheless admissible to prove, nonexclusively, "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2); see also United

---

[2]The government contends that we should review Mink's claims under the more rigorous plain error standard because Mink did not renew his motion to sever at the close of evidence. However, "[a] renewed motion for severance is unnecessary when the facts raised by a defendant in his or her pretrial motion do not materially differ from the facts that are admitted at trial." See United States v. Crumley, 528 F.3d 1053, 1062 (8th Cir. 2008). Only "when the trial produces a material change in the facts" must the motion to sever "be renewed so that the trial court can rule on the motion with the benefit, and in light of, knowledge of the true (and changed) situation." Id. (citation omitted). We need not decide which level of review is most appropriate in Mink's case because we find that his argument fails even under the more lenient abuse of discretion standard.

States v. Wright, 993 F.3d 1054, 1061 (8th Cir. 2021). As described above, each charge alleges a step in Mink's plan to harass L.L. and D.B., which in turn establishes his motive, preparation, plan, and identity for the other charges. Further, we find that the probative value of this evidence is not substantially outweighed by unfair prejudice. Fed. R. Evid. 403. This is not the kind of evidence that "divert[s] the jury's attention from the material issues in the trial" but rather aids the jury by establishing Mink's motive, plan, and identity throughout the events. Wright, 993 F.3d at 1061 ("Rule 403 does not offer protection against evidence that is merely prejudicial in the sense of being detrimental to a party's case. The rule protects against evidence that is *unfairly* prejudicial." (citation omitted)).

Next, Mink argues that the inclusion of Counts 5 and 13 (being a prohibited person in possession of an unregistered destructive device) unfairly prejudiced him as to the remaining counts because Counts 5 and 13 required the government to prove that Mink is a felon. Because he raises this argument for the first time on appeal, we review for plain error. Under the plain error standard of review in the severance context, "the defendant must 'show, in addition to an abuse of discretion by the district court, prejudice affecting his or her substantial rights and some extraordinary reason for us to reverse.'" Crumley, 528 F.3d at 1062-63 (citation omitted). He contends the joinder of these counts with the others runs afoul of our decision in United States v. Aldrich, where we stated, "[E]vidence that [the defendant] is a felon [is] of the inflammatory sort that may . . . sway[] the jury to convict him of the other charges even if the evidence [does] not support[] those charges." 169 F.3d 526, 529 (8th Cir. 1999) (second alteration in original) (citation omitted).

However, the issue in Aldrich was one of "retroactive misjoinder," which occurs "when joinder of multiple counts was proper initially, but later developments . . . render the initial joinder improper." Id. at 528 (alteration in original) (citation omitted). There, the defendant was convicted of two felon-in-possession charges and one charge of possessing an illegal firearm. Id. at 527. After the jury trial, the government and the defendant discovered that—before the

defendant's possession of the firearm—the state had restored all of the defendant's "rights, privileges and immunities" that were previously forfeited as a result of his prior felony. See id. at 527. The defendant filed a motion for a new trial, arguing that his two felon-in-possession convictions should be vacated based on the prior restoration of his rights and "that the evidence of his prior felony unfairly prejudiced his right to a fair trial" on the remaining count. Id. The district court granted the vacatur as to the defendant's felon-in-possession convictions but denied the defendant a new trial on the remaining count. Id. at 528. On appeal, the defendant argued that "the evidence of his prior felony conviction had a sufficiently prejudicial spillover effect to deprive him of a fair trial" on the remaining count, and we agreed. Id. The government should not have prosecuted the felon-in-possession charges, and "the jury should have never heard evidence concerning [the defendant's] prior felony conviction." Id. at 529. We found that the defendant suffered clear prejudice because the evidence of his prior conviction "divert[ed] the attention of the jury from the question of the defendant's responsibility for the crime charged to the improper issue of his bad character." Id. at 528 (citation omitted).

Here, Mink does not suffer from the same prejudice even under the typical abuse of discretion standard. First, his case is not one of retroactive joinder where his prior conviction was admitted under a now-vacated or -dismissed charge. Second, he stipulated to his status as a felon without any additional detail of his past felonies, which minimizes the prejudicial effect, if any, on his other convictions. See United States v. Rock, 282 F.3d 548, 552 (8th Cir. 2002). Finally, he has not shown that he would have had "an appreciable chance for acquittal" on the other charges absent his stipulation to his prior felony conviction. Because Mink cannot show prejudice, much less an extraordinary reason for reversal, we find that the district court did not plainly err in refusing to sever the indictment.

V.

Next, Mink argues that the district court erred in admitting evidence revealing that he was incarcerated at the time of the conduct alleged in Counts 14 and 15.

-15-

When, as here, the district court definitively rules on a party's in limine objection to the admission of evidence, we review for abuse of discretion. See United States v. Collier, 527 F.3d 695, 698-99 (8th Cir. 2008); United States v. Big Eagle, 702 F.3d 1125, 1130 (8th Cir. 2013) ("Under the Federal Rules of Evidence, '[o]nce the court rules definitively on the record' concerning a party's in limine objection to admission of evidence, 'a party need not renew an objection or offer of proof to preserve a claim of error for appeal.'" (alteration in original) (quoting Fed. R. Evid. 103(b))). We "will reverse only if admission [of the evidence] affected [the defendant's] substantial rights." United States v. Watson, 895 F.3d 589, 594 (8th Cir. 2018). Mink argues that proof of his incarceration greatly influenced the jury's deliberation on Counts 1-13 in violation of Federal Rule of Evidence 403. Rule 403 "grants the district court power to exclude relevant evidence 'if its probative value is substantially outweighed by a danger of . . . unfair prejudice.' 'Unfair prejudice means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" Id. (alteration in original) (citations omitted). Here, the fact that Mink was incarcerated had probative value as it provided context to the government's narrative and connected Mink to the Quad City Inn pipe bombs. On February 20, 2016, Mink rented a blue Chevrolet Spark to drive to FCI Milan; video surveillance shows a similar car driving near the Quad City Inn that same day. The next day, pipe bombs were discovered at the Quad City Inn. That Mink was incarcerated was also necessary to provide context to Mink's obstruction of justice charges because Mink instructed Stevens to destroy evidence and sign a false affidavit through letters and phone calls from FCI Milan.

Moreover, this probative value was not substantially outweighed by potential prejudice. In denying the motion, the district court said that it would "use strong and appropriate limiting instructions in an attempt to cure potential unfair prejudice as a result of this evidence." R. Doc. 152, at 3. The district court did in fact instruct the jury accordingly. R. Doc. 296, at 69-70 (explaining to the jury that it could not "infer from the fact that someone [had] previously been convicted of a crime that they must have committed others in the future" and that it could "use [the] evidence for the purpose for which it [was] admitted to demonstrate," which was "some

motive for when things happened and for no other purpose"). "[T]he presence of a limiting instruction diminishes the danger of any unfair prejudice arising from the admission of other acts." United States v. Buckner, 868 F.3d 684, 690 (8th Cir. 2017) (alteration in original) (citation omitted); see also Wright, 993 F.3d at 1064 ("[A] jury is presumed to follow all instructions."). Therefore, because the evidence was probative and the district court issued proper limiting instructions, we find that the district court did not abuse its discretion in admitting evidence showing that Mink was incarcerated.

VI.

Next, Mink argues that the district court erred in admitting evidence of uncharged conduct, including evidence that someone vandalized D.B.'s car, that someone placed putty in L.L.'s home exhaust pipe, that someone placed a pipe bomb in L.L.'s sister's car, and that someone stole his coworker's firearm. According to Mink, this evidence, coupled with the timing of the acts in relation to the charged conduct and their similarity to the same, gave rise to the inference that Mink was the individual behind these acts. Specifically, Mink argues that this evidence constitutes impermissible propensity evidence under Rule 404(b) and that it was substantially more prejudicial than probative in violation of Rule 403. Unlike the district court's definitive ruling on the admission of evidence showing that Mink was incarcerated, here the district court only *tentatively* admitted evidence of the uncharged conduct. R. Doc. 152, at 1 ("[T]he court is satisfied that *if* [the evidence] is presented in such a way as to permit the jury to find that it occurred by the preponderance of the evidence, it should be admitted." (emphasis added)). Because Mink failed to renew his objection when the government offered such evidence at trial, we review under the familiar plain error standard. See Big Eagle, 702 F.3d at 1130.

Here, the government asserts that the uncharged conduct is intrinsic to the charges against Mink and is therefore not subject to Rule 404(b)'s bar to propensity evidence. We agree. Federal Rule of Evidence 404(b) generally prohibits the use of "[e]vidence of any other crime, wrong, or act . . . to prove a person's character in

-17-

order to show that on a particular occasion the person acted in accordance with the character." However, "Rule 404(b) applies only to extrinsic, not intrinsic, evidence. 'Evidence of other wrongful conduct is considered intrinsic when it is offered for the purpose of providing the context in which the charged crime occurred.'" United States v. Young, 753 F.3d 757, 770 (8th Cir. 2014) (citations omitted). "This evidence is admissible because it 'completes the story or provides a total picture of the charged crime.'" Big Eagle, 702 F.3d at 1131 (citation omitted). The evidence of Mink's uncharged conduct provides context and significance to Mink's otherwise disparate actions. For example, this evidence shows that Mink's use of the red box truck to injure or intimidate L.L. and D.B. was not an isolated incident but rather part of Mink's continual harassment of the couple. Further, the evidence related to Mink's coworker's stolen pistol explains how Mink initially obtained possession of the firearm. Mink concedes as much. Appellant's Reply Br. 24 ("The glue that holds together the [g]overnment's theory that all 15 counts are part of a common scheme are allegations of a whole host of uncharged criminal conduct . . . ."). Because this evidence "help[s] to fill the gaps in the jury's understanding of the crime[s] charged," it is intrinsic evidence unaffected by Rule 404(b). Young, 753 F.3d at 770. Additionally, as to the claim that these "gap fillers" were substantially more prejudicial than probative in violation of Rule 403, we find that such error is not plainly obvious. Accordingly, the district court did not plainly err in admitting evidence of uncharged conduct.

## VII.

Next, Mink contends that the district court erred by not dismissing or even questioning the entire venire after a venireperson made prejudicial comments during voir dire, thus violating Mink's Sixth Amendment right to a fair and impartial jury. During voir dire, one venireperson—a clerk at the prosecuting attorney's office— noted that the prosecutors "were probably three of the best attorneys" with which the venireperson had worked. The venireperson further stated that she had seen Mink's defense attorney "on the other side of things in a not favorable light." Mink's

-18-

attorney moved to dismiss the entire jury pool; the district court summarily denied the request but struck the venireperson from the jury pool for cause.

We review "whether the district court conducted voir dire in a way that protected [a defendant's] Sixth Amendment right to a fair and impartial jury" for an abuse of discretion. United States v. Pendleton, 832 F.3d 934, 943 (8th Cir. 2016) (alteration in original) (citation omitted). "This deferential standard of review reflects the fact that the district court is in the best position to judge whether the dismissed venireperson's statements are so detrimental as to render the entire venire biased against a defendant." Id. Without the benefit of "observ[ing] the demeanor and response of the prospective jurors," it is practically impossible for this Court to grasp "the atmosphere of the [proceedings], the manner in which the words were spoken, or the probable effect, if any, which they had upon the merits of the controversy." Id. (citations omitted).

Mink relies solely on Mach v. Stewart, 137 F.3d 630 (9th Cir. 1997), where a venireperson, a social worker, talked extensively before the entire venire about how "she had never, in three years in her position, become aware of a case in which a child had lied about being sexually assaulted," the crime with which the defendant was charged. Id. at 632. The Ninth Circuit found that given the nature of the venireperson's "expert-like" statements, "the certainty with which they were delivered, the years of experience that led to them, and the number of times that they were repeated," at least one juror had presumably been "tainted" by the statements and had "entered into jury deliberations with the conviction that children simply never lie about being sexually abused," creating a biased jury. Id. at 633. We rejected a similar comparison to Mach in United States v. Lussier, 423 F.3d 838 (8th Cir. 2005), where a venireperson made disparaging comments about the defendant's witness before the entire venire. See id. at 840 (noting the venireperson's statement that the defendant's witness "had been a neighborhood nuisance"). There, we found that the remarks were distinct from Mach because they did not pertain to the defendant, much less bear upon his guilt of the crime charged. Id. at 842. We also

noted that the remarks were neither "expert-like nor highly inflammatory" as to cause the same type of prejudicial concerns.  Id.

Here, we find Mink's case more analogous to the facts present in Lussier.  The venireperson's comments were not directed at Mink or his guilt but rather Mink's counsel.  See id.; cf. United States v. Baker, 855 F.2d 1353, 1360-61 (8th Cir. 1988) (finding that the district court did not abuse its discretion when it did not question jurors individually about possible prejudice arising out of a newspaper article quoting a prosecutor stating that the defense counsel often misled the jury).  Further, this vague, isolated comment does not mirror the extensive, expert-like, and highly inflammatory statements at issue in Mach.  See Lussier, 423 F.3d at 842.  Given the nature of the venireperson's comments, which had no bearing on Mink's guilt, we find that the district court was under no obligation to further question the venire about the potential impact of the statements.  Cf. United States v. Medrano, 925 F.3d 993, 997 (8th Cir. 2019) ("In general, the district court has substantial discretion in conducting voir dire.").  Further, we find that the district court did not abuse its discretion in refusing to dismiss the entire venire.  See Pendleton, 832 F.3d at 945 ("Requiring the court inflexibly to start over again with a new venire panel every time—regardless of the nature, credibility, brevity, or volume of the statement—is a 'burden [that] cannot be placed upon the criminal processes and the selection of a jury.'" (alteration in original) (citation omitted)).

## VIII.

Next, Mink contends that the evidence was insufficient to support the jury's verdict on Counts 6, 14, and 15.  Specifically, Mink argues that there was insufficient evidence to prove (1) that Mink fraudulently used a means of identification, an element of Count 6; and (2) that there was an "official proceeding" underway on the dates alleged in the offense, an element of Counts 14 and 15.  "We review the sufficiency of the evidence in the light most favorable to the verdict and overturn [the conviction] only if no reasonable jury could find that the elements of the offense have been proven beyond a reasonable doubt."  United States v. Petruk, 781 F.3d

438, 441 (8th Cir. 2015) (alteration in original) (citation omitted).  If the argument turns upon statutory interpretation, "we review the district court's statutory interpretation de novo."  Id. (citation omitted).

## A.

Mink argues that there was no evidence that he used a "means of identification" because the debit card did not contain information sufficient to identify a specific individual.  18 U.S.C. § 1028(a)(7) (Count 6) requires that the government prove that the defendant used "a means of identification of another person" in connection with a crime.  "The phrase 'means of identification' is defined as 'any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual.'"  United States v. Foster, 740 F.3d 1202, 1207 (8th Cir. 2014) (citation omitted).  Such information "include[es], but [is] not limited to, a social security number, date of birth, driver's license number, or taxpayer identification number."  Id.  The information must collectively be "sufficient to identify a specific person."  Id. at 1207-08.  Here, the government's evidence showed that while Mink used his own address, phone number, and email address, Mink used the name, social security number, and date of birth of another, identifiable individual, T.S, to obtain the debit card.  Accordingly, we find that there was sufficient evidence for a reasonable jury to conclude that Mink used a "means of identification of another person."

Additionally, Mink argues that he did not "use" the means of identification within the meaning of the statute.  Relying on United States v. Gatwas, 910 F.3d 362 (8th Cir. 2018), Mink contends that his use of the individual's information was merely incidental to the debit card transactions because the debit card did not identify T.S. and the funds were drawn from Mink's own bank account.  See id. at 368 (noting that 18 U.S.C. § 1028A requires that "the use of another person's means of identification . . . be more than incidental to the fraud").  Mink's argument is misplaced.  In Gatwas, this Court interpreted 18 U.S.C. § 1028A (aggravated identity theft) which contains language different from Mink's crime of conviction,

-21-

§ 1028(a)(7). See id. at 366-67. Section 1028(a)(7) prohibits an individual from using a means of identification of another person "with the intent to commit, or aid or abet, or in connection with, any unlawful activity" that constitutes a felony. By contrast, § 1028A prohibits the use of such information when used "during and in relation to" the commission of prescribed felonies. We acknowledged in Gatwas that the language in § 1028(a)(7) is likely broader than that found in § 1028A. Id. ("This suggests that Congress employed the phrase 'during and in relation to' in § 1028A(a)(1) to limit the statute's breadth to a greater degree than the expanded phrase 'in connection with' that was added to § 1028(a)(7)."). Here, the evidence showed that Mink used the information to apply for the debit card that was used to purchase firearm accessories and services from PeopleFinders. Accordingly, we find that there was sufficient evidence for a reasonable jury to convict Mink on Count 6.

### B.

Mink also challenges the sufficiency of the evidence to support his conviction on Counts 14 and 15, the witness tampering and obstruction of justice charges, respectively. Specifically, he argues that the government did not prove that there was an "official proceeding" underway at the time he instructed Stevens to destroy evidence and sign the false affidavit. 18 U.S.C. § 1512(b)(2)(B) (Count 14) states:

> Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person with intent to . . . cause or induce any person to . . . alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding . . . shall be fined under this title or imprisoned not more than 20 years, or both.

Section 1512(c)(2) (Count 15) similarly states: "Whoever corruptly . . . obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years or both."

"An 'official proceeding' includes a proceeding before a federal judge, court, or grand jury, but not a state proceeding." Petruk, 781 F.3d at 444. Importantly, "the government need not prove that the defendant was aware that the proceeding was federal in nature," nor does "[t]he official proceeding 'need [to] be pending or about to be instituted at the time of the offense.'" Id. (citation omitted). The government must prove merely "that the defendant contemplated a particular, foreseeable proceeding, and that the contemplated proceeding constituted an 'official proceeding.'" Id. at 445. Here, Mink's actions—i.e., instructing Stevens to destroy a detonator after law enforcement had searched the house and to sign a false affidavit—by their very nature evince that Mink contemplated criminal liability in a future proceeding. Moreover, when instructing Stevens on the phone to destroy the detonator, Mink expressly acknowledged that the government was building a case against him. And in his letter requesting that Stevens sign the false affidavit, Mink explained how the affidavit would detrimentally affect the government's case against him. Viewing the evidence in the light most favorable to the jury's verdict, we find that there was sufficient evidence for a reasonable jury to find that Mink contemplated a particular, foreseeable proceeding. Accordingly, we find that the evidence was sufficient for a reasonable jury to convict Mink on Counts 14 and 15.

IX.

Next, Mink contends that there were myriad errors in the jury instructions. Specifically, he argues (1) that a mens rea element was omitted from multiple instructions; (2) that the instructions for Count 2 presupposed a factual finding; and (3) that the instructions for Count 3 allowed the same weapon to serve as both the "deadly weapon" for the underlying crime and the "dangerous weapon" for the enhancement. "A challenge to a jury instruction is reviewed for an abuse of discretion." United States v. Stanley, 891 F.3d 735, 739 (8th Cir. 2018). However, because Mink failed to object to these instructions at trial, "this [C]ourt reviews only for plain error." Id.

"The district court has wide discretion in formulating appropriate jury instructions," and rarely will "an improper instruction . . . justify reversal of a criminal conviction when no objection has been made in the trial court." Stanley, 891 F.3d at 739 (citations omitted). We "will not find error when the jury instruction 'fairly and adequately submitted the issue[] to the jury'" and will only reverse when "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Id. (alteration in original) (citations omitted). Accordingly, a defendant must show that but for the erroneous jury instruction, "there is a 'reasonable probability' that he would have been acquitted." Greer v. United States, 141 S. Ct. 2090, 2097 (2021) (citation omitted).

A.

Mink contends that the district court omitted a mens rea term, specifically "knowingly," from multiple jury instructions.[3] First, he argues that to be convicted of violating 18 U.S.C. § 842(i) (Counts 5 and 13), the jury was required to find that he "knowingly" received or possessed the explosive device. We have stated that a defendant must *knowingly* receive or possess the explosive device under § 842(i). See United States v. Joos, 638 F.3d 581, 588 (8th Cir. 2011). Here, the jury was instructed on Counts 5 and 13 to find merely that "[Mink] received or possessed an explosive." R. Doc. 207, at 13. However, "possession" was defined in a separate instruction as "*knowingly* ha[ving] direct physical control" or "both the power and the intention . . . to exercise dominion" over a thing. R. Doc. 207, at 19 (emphasis added). We find that, when taken as a whole, the instructions sufficiently articulated the "knowing" element such that the matter was fairly and adequately submitted to

_____

[3] Mink suggests that the failure to include a proper mens rea element in a jury instruction is an "uncurable structural error," resulting in per se unconstitutional prejudice. Appellant Br. 57. However, "the omission of a single element from jury instructions" is not a structural error but rather a "discrete defect[] in the criminal process" that does not "*necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." Neder v. United States, 527 U.S. 1, 9 (1999); Greer, 141 S. Ct. at 2100. Therefore, the omission of a mens rea element from the jury instructions is not structural error.

the jury.  See United States v. Henderson, 482 F.2d 558, 559-60 (8th Cir. 1973) (per curiam) (finding no error in similar jury instructions when the "knowing" requirement was contained in the given definition of "possession").  Accordingly, there was no error.

Next, Mink argues that to be convicted of violating 18 U.S.C. § 1028(a)(7) (Count 6) and 18 U.S.C. § 842(i) (Counts 5 and 13), the jury was required to find that he knew of his status as a felon.  In Rehaif v. United States, 139 S. Ct. 2191 (2019), the Supreme Court held that to convict an individual under 18 U.S.C. §§ 922(g) and 924(a)(2), the government must establish that the defendant knew of his felon status.  Id. at 2195-97.  The government concedes, and we agree, that the omission of this element was an error that was plain.  However, even under Rehaif, a defendant must show that the error affected his substantial rights to prevail under the plain error standard.  See United States v. Hollingshed, 940 F.3d 410, 415 (8th Cir. 2019).  Accordingly, Mink must "show a reasonable probability that, but for the error, the outcome of the proceeding would have been different."  Id. at 416 (citation omitted).[4]  Here, Mink makes no such argument on appeal,[5] but only, as discussed above, that the omission of this element resulted in structural error.  Accordingly, he

---

[4]The Supreme Court recently affirmed this standard in Greer: "In felon-in-possession cases, a Rehaif error is not a basis for plain-error relief unless the defendant first makes a sufficient argument or representation on appeal that he would have presented evidence at trial that he did not in fact know he was a felon."  Greer, 141 S. Ct. at 2100.

[5]Moreover, all that is required under Rehaif is that the government prove "that [the defendant] knew he belonged to the relevant category of persons barred from possessing a firearm."  United States v. Sholley-Gonzales, 996 F.3d 887, 895 (8th Cir. 2021) (alteration in original) (quoting Rehaif, 139 S. Ct. at 2200).  Here, Mink stipulated to his felon status at trial, R. Doc. 221, at 53, testified that he had committed felonies as far back as 2004, R. Doc. 297, at 36-37, and even alluded to the fact that he knew he could not possess firearms because he was a felon, see R. Doc. 297, at 125.  Notwithstanding our foregoing analysis, we find that this evidence eliminates any reasonable probability that the outcome of the proceeding would have been different but for the erroneous instruction.

has failed to show "there is a 'reasonable probability' that he would have been acquitted." Id. at 2097.

Next, Mink argues that to be convicted of violating 26 U.S.C. § 5861(d) (Counts 4 and 12), the jury must have found that Mink had "known" that the device was a "firearm" within the meaning of the statute and that he had a duty to register the device. Mink's first contention is without merit. Section 5845 includes "a destructive device" in the definition of "firearm." Id. § 5845(a)(8). Here, the jury was instructed to determine whether "the defendant knew that the device was a destructive device." Moreover, the jury was instructed that "[t]he defendant must have known the characteristics of the device that made it a 'destructive device" and was subsequently given a definition of "destructive device" consistent with § 5845(f). Because the jury was instructed to find whether Mink knew that the device was a destructive device based on its characteristics, we find no error in the instruction. Mink's second argument likewise fails as a matter of law. The government must prove merely "that the defendant knew of the physical characteristics of the weapon bringing the weapon within the ambit of the [regulation]," United States v. White, 863 F.3d 784, 790 (8th Cir. 2017), which was included in the jury instructions. The Supreme Court has repeatedly found that a defendant need not know that he had a duty to register explosive devices under § 5861 or that the devices were not registered. See United States v. Freed, 401 U.S. 601, 607-10 (1971) ("This is a regulatory measure in the interest of public safety, which may well be premised on the theory that one would hardly be surprised to learn that possession of hand grenades is not an innocent act"); see also Staples v. United States, 511 U.S. 600, 610-11 (1994) (reaffirming Freed); Rehaif, 139 S. Ct. at 2197 (citing Staples for the proposition that a mens rea is not presumed in an otherwise silent regulatory or public welfare provision). Accordingly, we find no error in the jury instruction.

In conclusion, we find that there were no plain errors in the jury instructions that affected Mink's substantial rights.

Next, Mink contends that the district court erred by giving an instruction on Count 2 that presupposed that the vehicle (the red box truck) was a "dangerous weapon," a finding necessary for an enhanced sentence under 18 U.S.C. § 2261(b)(3). The instruction for enhancement as to Count 2 stated: "[I]f you find the defendant guilty of the crime charged in that count, you will be asked in the verdict form to unanimously determine beyond a reasonable doubt whether the defendant used a dangerous weapon (a motor vehicle) during the commission of the offense." R. Doc. 207, at 8. Even if we were to agree that this instruction improperly removed the decision from the province of the jury, Mink cannot show that but for the erroneous instruction he would not have received the enhancement. Cf. Greer, 141 S. Ct. at 2097. Counts 3 and 10 included similar language as found in Count 2 but also an instruction defining a "dangerous weapon" as "an object used in a manner likely to endanger life or inflict serious bodily harm." R. Doc. 207, at 22. This instruction clarifies that the "(a motor vehicle)" language was added for the purpose of clarifying what weapon was at issue. Mink does not challenge this instruction, and the jury found the vehicle was a dangerous weapon on Counts 3 and 10. Because the jury found that the red box truck was a "dangerous weapon" as to Counts 3 and 10, he cannot show a reasonable probability that the outcome of the proceeding as to Count 2 would have been different but for the erroneous instruction. See Hollingshed, 940 F.3d at 416. Therefore, we find that Mink has not established an error as to his conviction on Count 2 that affected his substantial rights.

C.

Next, Mink argues that the instructions for Count 3 were erroneous.[6] To convict an individual under 18 U.S.C. § 2261(a)(1), the government had to prove that Mink (1) traveled in interstate commerce; (2) with the intent to kill, injure,

---

[6]Necessarily, if the instructions as to Count 3 were erroneous, the instructions as to Count 10 would be as well. However, Mink only challenges the instructions as they pertain to Count 3.

harass, or intimidate L.L.; and (3) in doing so, committed or attempted to commit a crime of violence against L.L. To establish that Mink committed or attempted to commit a crime of violence, the government had to prove that Mink committed aggravated battery under Illinois law, which requires a finding that the defendant used a "deadly weapon." R. Doc. 207, at 9. In order to establish the enhanced sentence under § 2261(b)(3), the government had to prove that Mink used a "dangerous weapon." Mink contends that the instructions impermissibly allowed the "motor vehicle" to serve as both the "deadly weapon" necessary for the underlying crime and the "dangerous weapon" necessary for the enhancement. In support of his proposition, Mink relies on Cunningham v. California, 549 U.S. 270 (2007), quoting, "A fact underlying an enhancement cannot do double duty; it cannot be used to impose an upper term sentence and, on top of that, an enhanced term." Id. at 280-81 (citing Cal. Penal Code § 1170(b)). However, Mink misconstrues this statement. The Supreme Court in Cunningham was merely reciting a requirement found in California's sentencing statute, not stating a separate legal rule. See id.

Mink further relies on a line of Seventh Circuit cases, but those cases are inapposite here as they concern sentencing enhancements specific to the United States Sentencing Guidelines, not mandatory minimum sentence enhancements under the United States Code. See, e.g., United States v. Tenuto, 593 F.3d 695, 697 (7th Cir. 2010) (discussing a sentencing court's inability to use conduct accounted for in a defendant's base offense level to additionally enhance the defendant's guideline range). Additionally, Mink argues that § 2261, as a matter of statutory construction, requires the proof of two different weapons because the statute does not indicate that the "deadly weapon" and the "dangerous weapon" can be the same. However, Mink raises this argument for the first time in his reply brief, and it is accordingly waived. See United States v. Morris, 723 F.3d 934, 942 (8th Cir. 2013). Therefore, Mink has failed to show that there was an error in the jury instructions as to Count 3, much less one that was plain.

X.

Lastly, Mink contends that his conviction on Count 8 must be vacated because the predicate crime of violence alleged in the count is impermissibly broader than the definition of "crime of violence" in 18 U.S.C. § 924(c) (Count 8). Specifically, Mink argues that the commission of arson in violation of 18 U.S.C. § 844(i), the predicate crime of violence, is impermissibly broad because an individual may be convicted under that section for committing arson against his or her own property whereas possession of a firearm in furtherance of a crime of violence in violation of § 924(c) requires the government to prove that the defendant committed the predicate crime against the property or person of *another*. The government concedes that Mink's argument is a correct statement of the law and that violation of § 844(i) does not qualify as a crime of violence as defined by § 924(c). Accordingly, Mink's conviction with respect to Count 8 must be vacated.

In response, the government requests that Mink's sentence be vacated on all counts under the "sentencing package doctrine" so the district court can guarantee that the overall sentencing plan remains adequate. "Under the sentencing package doctrine, we 'may vacate the entire sentence on all counts so that, on remand, the trial court can reconfigure the sentencing plan to ensure that it remains adequate to satisfy the sentencing factors in 18 U.S.C. § 3553(a).'" United States v. McArthur, 850 F.3d 925, 943 (8th Cir. 2007) (citation omitted). We apply the doctrine when there is a "multicount indictment[] and a successful attack by a defendant on some but not all of the counts of conviction." Id. (citation omitted). We have found such discretionary vacatur appropriate when the vacatur of the sentence as to one or more counts results in a significantly lower sentence than what the district court originally contemplated. See id. (finding that the sentencing package doctrine was appropriate when the vacatur of one conviction reduced defendant's sentence from 516 months to 216 months imprisonment). Here, Mink's sentence would be reduced from 600 months to 240 months imprisonment if the doctrine were not applied. Accordingly, we find that it is appropriate to apply the doctrine and vacate Mink's sentence as to all counts to allow "the trial court [to] reconfigure the sentencing plan to ensure that

[Mink's sentence] remains adequate to satisfy the sentencing factors in [§ 3553(a)]." Id.

## XI.

For the foregoing reasons, we vacate Mink's conviction on Count 8, affirm his convictions on the remaining counts, vacate Mink's entire sentence, and remand for resentencing.[7]

_____

_____

[7]Mink has filed a "Motion to Appeal Order to Deny Access to the Courts By Not Granting Court Filings to Defendant" pro se.  Because Mink is represented by counsel, we decline to consider his pro se motion.  See United States v. Carr, 895 F.3d 1083, 1090 (8th Cir. 2018) ("It is Eighth Circuit policy not to address issues raised by a defendant in pro se filings with this Court when he is represented by counsel." (citation omitted)).